UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
                                              :
                                              :
IN RE ALUMINUM WAREHOUSING               :         MDL No. 2481
ANTITRUST LITIGATION                          :
                                              :      Master Docket No.
This Document Relates To:                     :       13-md-2481-KBF
                                              :
ALL ACTIONS                                   :
                                              :
                                              :
                                              :
```

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS' JOINT RESPONSES TO
PLAINTIFFS' SUPPLEMENTAL SUBMISSIONS**

Defendants submit the attached letters in response to plaintiffs' supplemental submissions of July 2, 2014 (ECF Nos. 484, 486, 487, 488, and 489).  Rather than respond individually to each of the overlapping submissions filed by the different groups of plaintiffs, defendants have attempted, for the Court's convenience, to consolidate and synthesize their responses in the following three joint letters:

Defendants' Response to Plaintiffs' Standing Arguments.................................................... Tab A

Defendants' Response to the First-Level Purchasers' Submissions ....................................Tab B

Defendants' Response to the Mag and Agfa Submission .....................................................Tab C

Dated: New York, New York
     July 10, 2014

Respectfully submitted,

/s/ Richard C. Pepperman, II
Richard C. Pepperman, II
(*peppermanr@sullcrom.com*)
Suhana S. Han (*hans@sullcrom.com*)
Joseph J. Matelis (*matelisj@sullcrom.com*)
M. David Possick
(*possickmd@sullcrom.com*)
Yavar Bathaee (*bathaeey@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants The Goldman
Sachs Group, Inc., GS Power Holdings,
LLC, MCEPF Metro I, Inc., Mitsi Holdings
LLC, and Metro International Trade
Services, L.L.C.*

/s/ Margaret M. Zwisler (on consent)
Margaret M. Zwisler (admitted *pro hac vice*)
(*margaret.zwisler@lw.com*)
William R. Sherman (*william.sherman@lw.com*)
Jennifer L. Giordano (*jennifer.giordano@lw.com*)
Jeffrey H. Newhouse (*jeffrey.newhouse@lw.com*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

*Attorneys for Defendant The London Metal
Exchange and LME Holdings, Ltd.*

/s/ Robert D. Wick (on consent)
Robert D. Wick (*rwick@cov.com*)
Neil K. Roman (*nroman@cov.com*)
Henry Liu (*hliu@cov.com*)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-5758
Facsimile: (202) 778-5758

*Attorneys for Defendants Henry Bath, LLC
and JP Morgan Chase & Co*

/s/ John M. Nannes  (on consent)
John M. Nannes (*john.nannes@skadden.com*)
John H. Lyons (admitted *pro hac vice*)
(*john.h.lyons@skadden.com*)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:  (202) 371-7500
Facsimile:  (202) 661-9191

*Attorneys for Defendant Pacorini Metals USA, LLC*

/s/ Eliot Lauer  (on consent)
Eliot Lauer *(elauer@curtis.com)*
Jacques Semmelman
*(jsemmelman@curtis.com)*
Chelsea McLean
*(chelsea.mclean@curtis.com)*
CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
101 Park Avenue
New York, NY  10178-0061
Telephone: (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendant Glencore Ltd.*

# Tab A

**Margaret M. Zwisler**
Direct Dial: 202-637-1092
margaret.zwisler@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Milan |
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New Jersey |
| Brussels | New York |
| Chicago | Orange County |
| Doha | Paris |
| Dubai | Riyadh |
| Düsseldorf | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

July 10, 2014

**VIA ECF AND HAND DELIVERY**

The Honorable Katherine B. Forrest
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

Re:     *In re Aluminum Warehousing Antitrust Litig.*, No. 1:13-md-02481-KBF-RLE

Dear Judge Forrest:

We are writing on behalf of all defendants to respond to plaintiffs' supplemental submissions on the pending motion to dismiss on grounds of antitrust standing. Plaintiffs ask for leave to amend their complaints to attempt to allege that all of the defendants here illegally restrained trade in a relevant market. But plaintiffs' proposed amendments still would not allege that they are consumers or competitors in the relevant market of the purported restraint, or that they are a necessary step in the effectuation of the alleged scheme. This Court should deny their request to amend because the proposed amendments would not cure their antitrust injury and standing problems and thus would be futile. *E.g.*, *Krys v. Pigott*, 749 F.3d 117, 134-35 (2d Cir. 2014) (affirming denial of leave to amend because amendment would be futile); *Mortimer Off Shore Servs. v. Fed. Republic of Germany*, 615 F.3d 97, 99, 113-17 (2d Cir. 2010) (same).

Plaintiffs dispute that a plaintiff cannot incur antitrust injury unless it is a consumer or competitor in the allegedly restrained market or an instrumentality of the defendants' purported scheme, but plaintiffs offer the Court *no* contrary authority in this Circuit that has granted standing to any other type of plaintiff. The Seventh Circuit's *Loeb* opinion does not help them either. As explained in defendants' reply and at oral argument, *Loeb* did not consider the question of antitrust injury; rather, it held that, where the defendants allegedly fixed the very index price that the *Loeb* plaintiffs paid, plaintiffs' injury was not too remote from the anticompetitive conduct to deprive them of standing under *Associated General Contractors*. *See* Defendants' Reply in Support of their Joint Motion to Dismiss All Federal and State Antitrust Claims for Lack of Antitrust Standing at 10-13 (ECF No. 455) ("Defs. Reply"). Here, by contrast, plaintiffs do not allege that the defendants fixed the Platts premium that plaintiffs allegedly paid. They allege at most that defendants engaged in warehouse conduct that had an indirect *effect* on the level of physical premiums. *See id.* A finding that Plaintiffs have antitrust injury and antitrust standing thus would require a huge leap beyond *Loeb*, a decision already at the outermost edges of antitrust standing doctrine.

LATHAM&WATKINS LLP

Nothing in plaintiffs' arguments, or supplemental submissions, reflects an allegation that any of them are customers or competitors in the alleged relevant market of warehousing services, or instrumentalities of the purported scheme, and thus none of them have alleged an essential element of their claim.

## I.  FLPS CANNOT AMEND THEIR COMPLAINT TO ALLEGE THAT THEY ARE CONSUMERS OR COMPETITORS IN THE ALLEGEDLY RESTRAINED MARKET FOR WAREHOUSING SERVICES

The First Level Purchasers ("FLPs") say that, although their complaint does not allege it now, if given the chance to amend, they would allege that some of them purchased aluminum directly from one of the financial firm defendants and that some of them competed with warehouse defendants for aluminum supplies from smelters, and that those named plaintiffs have standing as consumers or competitors.  *See* Direct Purchaser Plaintiffs' Presentation on Antitrust Standing (June 20, 2014), slides 7-17, 43 ("FLP Slides"); FLP July 2, 2014 Letter at 5 ("FLP Ltr.") (ECF No. 487).  Such an amendment would make no difference here.  Even if the FLPs amended their complaint to allege, for example, that Ampal purchased directly from one of the defendants in the physical aluminum market, that would not make Ampal a consumer *in the allegedly restrained market*, which is what is necessary for antitrust injury.  Defs. Reply at 6-7.  Plaintiffs allege that defendants restrained output and therefore competition in the market for *warehousing services*, when defendants' warehouses supposedly stopped competing with each other on the basis of load-out speed or otherwise treated the LME's minimum rate as a maximum.  *Id.* at 7-10.  Ampal does not claim to have purchased warehousing services at all, much less from one of the defendants.  Thus, an amendment to allow Ampal to allege that it purchased aluminum from a defendant in the physical market would not give Ampal antitrust injury as a consumer in the allegedly restrained market.[1]

FLPs also say that they are competitors of the warehouse defendants because they compete with the warehouses for supplies of aluminum because some warehouses purportedly pay incentives to producers to entice them to deliver excess metal to defendants' warehouses instead of selling it to the plaintiffs.  *E.g.,* FLP Slides at 43; June 20 Tr. at 55:16-:22.  Even if that were true, it would not make plaintiffs competitors in the allegedly restrained market for warehousing services because none of them provide warehousing services at all, much less in

---

[1]  Even if purchases from a defendant in the physical market could confer standing, the Court would still need to dismiss the claims of all the other named plaintiffs who cannot allege that they purchased directly from a defendant.  Similarly, with respect to plaintiff Talan, plaintiffs admit that, at most, they could allege that Talan purchased aluminum from a non-defendant company that had stored the metal in defendants' warehouses.  June 20, 2014 Tr. at 48:22-49:2 ("June 20 Tr."); FLP Slides at 15-16.  But that does not make Talan a consumer of warehousing services.  Rather, it means that, at least for those purchases, Talan is not even a "first level" purchaser and therefore is not even within the FLPs' class definition.  *See* First Level Purchasers' Second Corrected Consolidated Amended Class Action Complaint ¶ 320 (ECF No. 265).

LATHAM&WATKINS LLP

competition with defendants.

## II.     PLAINTIFFS CANNOT AMEND THEIR COMPLAINT TO ALLEGE THAT THEY ARE THE INSTRUMENTALITIES OF DEFENDANTS' PURPORTED SCHEME

Plaintiffs clearly do not like the word "instrumentality" as a descriptive of a third way that plaintiffs can allege antitrust injury. Instead of "instrumentality," the Court can substitute the Supreme Court's own terminology of "necessary step" or "means . . . to achieve". They all mean the same thing.

In *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479 (1982), the Supreme Court held that McCready's injury was "inextricably intertwined" because that injury was a "necessary step" or "means . . . to achieve" the defendants' unlawful objective. It stated that *McCready* suffered antitrust injury because "[d]enying reimbursement to subscribers for the cost of treatment was **the very means by which it is alleged that Blue Shield sought to achieve its illegal ends**. The harm to McCready and her class was clearly foreseeable; indeed, it was a **necessary step in effecting the ends of the alleged illegal conspiracy**." *Id.* (emphasis added).

This clear meaning of "inextricably intertwined" is not controversial in the context of antitrust standing; numerous courts have held that this is precisely what *McCready* means. Indeed, in *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983), the Second Circuit found persuasive the district court's conclusion that "[j]ust as the Blue Cross' refusal to honor McCready's bill for treatment by a psychologist was **a means to defendants' objective** to drive out psychologists in favor of psychiatrists, so the destruction of Crimpers' trade show, which was designed to keep buyers and sellers of cable programming from transacting business face-to-face, **was a means to eliminate competition** by producers in dealing with television stations." *Id.* at 292 (emphasis added). Many other courts have held similarly. *See, e.g., Sigmapharm v. Mutual Pharmaceutical Co., Inc.*, 454 F. App'x 64, 69-70 (3d Cir. 2011) (affirming dismissal because plaintiff did not "adequately plead that its injuries were the means by which the defendants [sought] to achieve their anticompetitive ends;" indeed, "defendants could have effectuated their conspiracy even if [plaintiff] did not exist."); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) ("[T]he class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market, and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends."); *Province v. Cleveland Press Publishing Co.*, 787 F.2d 1047, 1052 (6th Cir. 1986) ("An inextricably intertwined injury is one that results from the manipulation of the injured party as a means to carry out the restraint of trade in the product market."); *Caruana v. Gen. Motors Corp.*, 204 F. App'x 511, 517 (6th Cir. 2006) ("To merit standing under the 'inextricably intertwined' category, a plaintiff must assert that defendants used him as a 'a fulcrum, conduit or market force to injure competitors or participants in the relevant product or geographical markets.'" (internal quotations and citation omitted)).

No plaintiff has alleged that its injury was a "necessary step" or "means . . . to achieve" defendants' alleged conspiracy and no amendment could cure that problem because it is clear that defendants could have completed their alleged conspiracy regardless of whether plaintiffs made the purchases that they claim hurt them. Defs. Reply at 4-6.

LATHAM&WATKINS LLP

At the hearing, plaintiffs argued that the Second Circuit's test for antitrust injury in *Gatt Communications, Inc. v. PMC Associates, L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013), trumps *McCready* and expands the definition of "inextricably intertwined" beyond those who are necessary steps or means to achieve the alleged conspiracy. June 20 Tr. at 84:12-87:13. That is wrong. *Gatt* did not address *McCready* or the meaning of "inextricably intertwined" because it did not have to do so; the plaintiff in *Gatt* was a competitor in the allegedly restrained market.[2] *Gatt* simply confirmed the Supreme Court's long-established holding that the antitrust injury requirement "'ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place.'" 711 F.3d at 76 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). *Gatt* further confirmed that the Court must "compar[e] the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges", and that "[i]t is not enough for the actual injury to be causally linked to the asserted violation." *Id.* (internal quotations and citations omitted). That is no different from what the Second Circuit held 30 years earlier in *Crimpers*—a case that did address *McCready* and what it means to be inextricable intertwined. 724 F.2d at 294. *Gatt* is just another example of a case where a competitor in the allegedly restrained market did not have antitrust injury, thus proving that not all competitors necessarily do so.

## III.   COMMERCIAL END USERS' PROPOSAL TO AMEND THEIR COMPLAINT TO STATE A FEDERAL DAMAGES CLAIM WOULD NOT CURE THEIR ANTITRUST STANDING PROBLEM

The Commercial End Users request permission to amend to state a damages claim under Section 4 of the Clayton Act because they claim that they—and not the FLPs—are the most efficient enforcers of the antitrust laws. Commercials July 2, 2014 Letter at 2 (ECF No. 486). They apparently contend that, if the Court is inclined to extend *Loeb* to conclude that one group of plaintiffs has antitrust standing in these unprecedented circumstances, the Court should pick them instead of the FLPs or the Consumers, and, if it does, then that means they can assert a federal damages claim because FLPs would have no claim.

First, as discussed at length in defendants' reply brief, neither *Loeb* nor any other case supports a finding of antitrust injury for *any* group of plaintiffs here. Defs. Reply. at 10-13. An amendment to state a damages claim would not cure that problem. In any event, the Commercial End Users' federal damages claim would fail the *AGC* test because (1) their alleged injuries would be indirect and remote, (2) there would still be more efficient enforcers of the antitrust laws (the companies that paid the warehouse rent), and (3) their injuries are speculative. *See* Defendants' Motion to Dismiss All Federal and State Antitrust Claims for Lack of Antitrust Standing at 15-22 (ECF No. 314).

---

[2]      Plaintiffs' reliance on *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009), as a supposed instrumentality case is misplaced. *See* FLP Slides at 33. In *DDAVP*, the Second Circuit found antitrust injury because plaintiffs were direct purchasers from defendants who alleged that they were forced to pay supra-competitive prices for a drug because of the defendants' conduct. 585 F.3d at 688.

LATHAM&WATKINS LLP

## CONCLUSION

For the foregoing reasons and those reasons set forth in defendants' motion to dismiss, the Court should dismiss plaintiffs' federal and state antitrust claims *with prejudice* and should not grant plaintiffs leave to amend.

Respectfully submitted,

/s/ Margaret M. Zwisler
Margaret M. Zwisler (admitted *pro hac vice*)
(*margaret.zwisler@lw.com*)
William R. Sherman (*william.sherman@lw.com*)
Jennifer L. Giordano (*jennifer.giordano@lw.com*)
Jeffrey H. Newhouse (*jeffrey.newhouse@lw.com*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

*Attorneys for Defendant The London Metal Exchange and LME Holdings Limited*

cc:     All Counsel of Record (via ECF)

# Tab B

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588

WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

July 10, 2014

<u>Via ECF and Hand Delivery</u>

The Honorable Katherine B. Forrest,
    United States District Court,
        Southern District of New York,
            500 Pearl Street,
                New York, New York  10007-1312

Re:    <u>*In re Aluminum Warehousing Antitrust Litig.*</u>, 13-MD-2481 (KBF)

Dear Judge Forrest:

I write on behalf of all defendants to address the merits aspects of the two supplemental submissions (ECF Nos. 484 & 487) filed by the first-level purchaser plaintiffs ("FLPs") on July 2, 2014.  (Defendants respond to the standing arguments advanced by all plaintiffs in a separate letter.)  The FLPs' submissions, which are really sur-replies that say very little new, do not salvage their inadequately pled claims under Sections 1 and 2 of the Sherman Act.

## A.    The FLPs Have Not Stated a Section 1 Claim.

*1.    The Alleged Agreement Between the LME and Metro Is Vertical and Thus Not Subject to the Per Se Rule.*  The FLPs argue that "controlling law provides that the summary judgment [stage], rather than the pleading stage, is the appropriate time to determine whether an alleged violation of Section 1 qualifies for *per se* or rule of reason treatment."  (ECF No. 487 at 3.)  That is incorrect, particularly where, as here, the answer to that question is clear.  (*See* GS Reply at 8-14 (ECF No. 457).)  Numerous courts have (i) held at the motion-to-dismiss stage that the *per se* rule does not apply, and (ii) dismissed the complaint for failure to plead a rule-of-reason claim.  *See*, *e.g.*, *Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, 2012 WL 2376466, at *9-13 (S.D.N.Y. June 20, 2012); *Solent Freight Servs., Ltd. v. Alberty*, 914 F. Supp. 2d 312, 320-21 (E.D.N.Y. 2012).

The FLPs' reliance (ECF No. 487 at 3 n.3) on *In re High-Tech Employee Antitrust Litigation*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012), is misplaced.  The parties there

"agree[d]" that "the Court need not decide now [at the motion-to-dismiss stage] whether *per se* or rule of reason analysis applies." *Id.* at 1122. That is not true here. The Court also held that "Plaintiffs have successfully pled a *per se* violation of the Sherman Act for purposes of surviving a 12(b)(6) motion." *Id.* Again, that is not true here.

Citing *Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, 530 F.3d 204 (3d Cir. 2008), the FLPs argue that, "even were the Court to find the alleged conspiracy as a mix of horizontal and vertical restraints, that would not preclude per se treatment." (ECF No. 487 at 3 n.5.) *Mack Trucks* actually distinguishes between horizontal and vertical theories and confirms that the rule of reason applies to the FLPs' allegations of a vertical Metro-LME agreement. Although the Third Circuit held that an "agreement among Mack dealers . . . involved horizontal competitors colluding to control prices and, therefore, would be *per se* unlawful," 530 F.3d at 221, the court analyzed the vertical portion of the alleged conspiracy between the truck manufacturer and its authorized dealers under the rule of reason, explaining that "rule of reason analysis applies even when, as in this case, the plaintiff alleges that the purpose of the vertical agreement between a manufacturer and its dealers is to support illegal horizontal agreements between multiple dealers." *Id.* at 225.

2.     *The FLPs Fail To Plead Any Facts That Support Their Proposed Relevant Markets.* The FLPs incorrectly assert that they "are not required to plead a relevant market" to allege a rule-of-reason claim. (ECF No. 487 at 4.) To the contrary, when reviewing a rule-of-reason claim under Rule 12(b)(6), courts "evaluat[e] the extent to which a defendant exercises power in the alleged relevant market," which "must be properly defined" and "has two components, product and geographic." *Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*, 414 F. App'x 372, 375 (2d Cir. 2011); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir 2001) ("To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes . . . .") (internal quotation marks omitted). The FLPs conflate their separate obligations in pleading a rule-of-reason claim to allege both (i) a relevant market and (ii) defendants' possession of sufficient market power in that purported market to restrain competition. *See, e.g.*, *Todd*, 275 F.3d at 206 (holding that "plaintiff's complaint alleges a plausible product market" and then explaining that "[i]f a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power" even without "a threshold showing of market share").

Alternatively, the FLPs seek leave to plead "an alternative relevant product market: exchange traded warehouse storage of primary aluminum." (ECF No. 487 at 4.) That proposed amendment would not save their Section 1 claim. *First*, "[i]n order to plead an antitrust violation under the rule of reason, a plaintiff must allege . . . both a product market and a geographic market." *Mooney v. AXA Advisors, L.L.C.*, 2014 WL 1978595, at *6 (S.D.N.Y. Apr. 10, 2014) (internal quotation marks omitted). But the FLPs' submission is silent on the relevant *geographic* market, "which is essential for assessing the potential harm to competition from defendants' alleged misconduct." *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 481 (S.D.N.Y. 2001). *Second*, the FLPs identify no proposed factual allegations in support of their new suggested product

The Honorable Katherine B. Forrest                                          -3-

market; they simply propose an alternative product market with no supporting facts. "[W]here the plaintiff 'offers no plausible argument as to how the failure to plead a relevant market could be rectified through an amended complaint,' denial of leave to amend and dismissal 'of the antitrust claims with prejudice is appropriate." *Smugglers' Notch*, 414 F. App'x at 377 (internal quotation marks omitted).

     3.     *The FLPs Cannot State a Section 1 Claim Based on Metro's Incentive Payments.*  The FLPs seek leave to add additional allegations challenging under Section 1 Metro's payment of upfront incentives as a form of discounted rent.  (ECF No. 487 at 4-5.)  Their complaint alleges that Metro and other warehouse operators compete for storage business by offering either discounted rental rates or upfront incentive payments. The FLPs offer no new facts suggesting that such seemingly procompetitive incentive payments harmed competition in any of their proposed warehousing markets or explaining why it is supposedly illegal under the antitrust laws for an aluminum owner to choose to store its aluminum instead of selling it to a user or for a warehouse operator to compete to provide storage services to such an owner.

     The February 2011 email chain attached to the FLPs' letter (ECF No. 487, Ex. A) makes clear that Metro's incentive payments are a classic source of competition, just as building owners and car leasors offer incentives to attract customers.  In selectively quoting from the email chain, which discusses a potential incentive payment to Alcoa, the FLPs' letter omits the following language from the sentence it quotes:  "which provides a competitive alternate customer."  This omitted language shows that Metro, in offering incentives payments, essentially becomes "a competitive alternate customer" for aluminum producers such as Alcoa by offering storage services and the opportunity to sell excess production through the LME.

     4.     *The FLPs' "Overarching Conspiracy" Claim Fares No Better.*  The FLPs also remind the Court that they "do in fact allege a horizontal conspiracy among all Defendants similar to that alleged by the other Plaintiffs."  (ECF No. 487 at 5.)  This implausible theory also fails as a matter of law.  (*See* GS Reply at 27-37 (ECF No. 457).)  The FLPs' vague statement that they "would be able to build on [their] allegations in an amended pleading by, among other things, developing allegations about the link between Defendants' trading operations and warehousing operations" (ECF No. 487 at 5) is insufficient to state a claim.  The FLPs provide no hint of the new factual allegations they supposedly would plead that would establish such a link, and they ignore the LME's information-barrier rules that regulate any contact between affiliated trading and warehousing operations.  The FLPs also offer nothing in response to the Court's unanswered questions at the last hearing about how defendants' traders supposedly met and conspired.  (Tr. 6/20/14 at 183:10-184:16.)

     The other two "new" documents attached to the FLPs' letter (ECF No. 487, Exs. B & C) merely show that Metro sought on its own to load out aluminum from its Detroit warehouses at the minimum rate required by the LME and no faster.  Neither document says anything that suggests that Metro conspired with any other firm or that Goldman Sachs or Metro "had de facto control" (ECF No. 487 at 3) over the LME.

The Honorable Katherine B. Forrest                                    -4-

**B.      The FLPs Have Not Stated a Section 2 Claim.**

*1.       Section 2 Requires a Relevant Market*.  The FLPs wrongly insist that they need not plead a relevant market to state a Section 2 claim, citing three cases as "compelling case law to the contrary."  (ECF No. 484 at 3.)  Two of those cases do not even involve Section 2.  *See FTC v. Ind. Federation of Dentists*, 476 U.S. 447, 455 (1986) ("[T]he legal question before us is whether the Commission's factual findings, if supported by evidence, make out a violation of Sherman Act § 1."); *United States v. American Express Co.*, 2014 WL 1817427, at *4 (E.D.N.Y. May 7, 2014) ("Plaintiffs brought suit . . . alleging that Visa, MasterCard, and Amex's anti-steering rules violate Section 1 of the Sherman Act.").  Although the third case suggests that market definition may not be required in a Section 2 case, that suggestion is dicta because the district court held that a relevant market was alleged.  *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 53-54 (S.D.N.Y. 2012).  That dictum also has been criticized by commentators as "doubtful" and "quite inconsistent with the Supreme Court's conclusion in *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993)," that a Section 2 claim requires a relevant market.  PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 531, at 153 (2014 Supp.).  It is also contrary to Second Circuit precedent.  *See Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006) ("Plaintiff's argument that she need not delineate a geographic market is one we cannot adopt.  Instead, plaintiff claiming monopolization is obligated to establish the relevant market because the power to control prices or exclude competition only makes sense with reference to a particular market.") (footnote omitted).

In the alternative, the FLPs argue that their complaint identifies "three plausibly alleged alternative markets."  (ECF No. 484 at 3.)  That argument misses the point:  the FLPs' complaint pleads no *facts* in support of any of those proposed markets.  Their letter does not remedy this deficiency:  the two paragraphs of the complaint it cites (*id.* (citing Compl. ¶¶ 306-07)) propose various alternative markets without any supporting factual allegations.

*2.       The FLPs Fail To Allege Direct or Indirect Evidence of Monopoly Power*.  The FLPs falsely assert that "there is no basis in law (or common sense) for th[e] flawed proposition" that Metro cannot monopolize a market in which it does not compete.  (ECF No. 484 at 1.)  In fact, the Second Circuit has held that "it is axiomatic that a firm cannot monopolize a market in which it does not compete."  *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998).  Ignoring this Second Circuit decision, the FLPs contend that "*Crude Oil* rejected this argument" by recognizing that "'an antitrust injury can[] extend beyond the bounds of the monopolized market.'"  (ECF No. 484 at 4 (quoting *Crude Oil*, 913 F. Supp. 2d at 57).)  But there is no inconsistency between the quoted language in *Crude Oil* and the Second Circuit's holding in *Discon*.  *Crude Oil* is distinguishable in all events because the FLPs do not allege that Metro ever purchased any physical aluminum, let alone owned a dominant share of the available supply of the physical commodity, as was the case in *Crude Oil*.  (*See* GS Reply at 21 (ECF No. 457).)  Metro is alleged to operate only in the metals storage business.

The Honorable Katherine B. Forrest                                    -5-

The FLPs further state that Metro has admitted that it "compete[s] with aluminum consumers for producers' surplus metal." (ECF No. 484 at 5 (internal quotation marks omitted).) But the FLPs never explain how a firm in the storage business that does not produce, own, sell or establish prices for physical aluminum (but rather stores aluminum owned by others) can control prices or exclude competition in that purported market.

With regard to supposed indirect evidence of monopoly power, the FLPs' letter, like their complaint, says not one word about supposed barriers to entry, a fatal omission. Nor do they identify any market shares that would create a plausible inference of monopoly power in any relevant market that includes both LME and non-LME warehouses or that is global in geographic scope.

  *3.*     *The FLPs Fail To Allege Anticompetitive Conduct.*  The FLPs' discussion of "anticompetitive conduct" (ECF No. 484 at 2) does not respond to *any* of the arguments in Goldman Sachs' reply. (*See* GS Reply at 23-27 (ECF No. 457).) Instead, they argue that their "allegations must be viewed as a whole" as part of "'a monopoly broth.'" (ECF No. 484 at 2 (quoting *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928, 935 (2d Cir. 1981)).) In *City of Groton*, however, the Second Circuit "reject[ed] the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act." 662 F.2d at 928-29. More recently, the Second Circuit, citing *City of Groton*, made clear that where "alleged instances of misconduct are not independently anti-competitive . . . they are not cumulatively anti-competitive either." *Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 486 F. App'x 186, 191 (2d Cir. 2012); *see also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1367 (Fed. Cir. 1999).

**C.     The FLPs' Additional Suggested Allegations Would Not Support a Claim.**

Aside from general assurances that they could supplement their current complaint, the FLPs identify only two specific categories of allegations that might be added to a second consolidated amended complaint, neither of which supports a claim.

  *1.*     *The FLPs Offer Only Speculation about International Commodities Services, Ltd. ("ICS").*  The FLPs state that they "*may* allege that ICS is an additional conspiratorial link," asserting that a representative of ICS "sits on the LME Warehousing Committee" and that "Metro, Pacorini, and Henry Bath share" ICS as their London Agents. (ECF 487 No. at 5 (emphasis added).) The FLPs then assert that "this surely facilitates collusion." (*Id.*) But even the FLPs appear to acknowledge that ICS provides ministerial services related to the "LMEsword transactional database." (*Id.*) It requires an unwarranted leap of logic to conclude that multiple warehouse companies' use of the same ministerial service evidences an antitrust conspiracy, and such speculation is insufficient to plead a plausible Section 1 violation. "[I]t is well settled that the mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." *Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 579 n.30 (S.D.N.Y. 2007) (internal quotation marks omitted); *accord Maric v. St. Agnes Hosp. Corp.*, 65 F.3d 310, 313 (2d Cir. 1995); *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).

The Honorable Katherine B. Forrest                                        -6-

     2.    *The Proposed Allegations Concerning Glencore Ltd. Do Not Plausibly Plead Its Participation in an Antitrust Conspiracy.*  The FLPs offer various additional pieces of information about Glencore Ltd.  (ECF No. 487 at 5.)  At most, those proposed allegations show that a company active in the sale of physical aluminum maintains an inventory of aluminum and has a representative on the board of a company that produces aluminum.  They are not a basis for an antitrust claim.

     3.    *The FLPs Have Not Presented the Court with Any Other Proposed Factual Allegations.*  They instead offer only assurances that they will be able to plead viable claims if given another opportunity to amend their complaint.[*]  Under these circumstances, allowing the FLPs to amend again would be both futile and unfair to defendants.  *See*, *e.g.*, *Smugglers' Notch*, 414 F. App'x at 377 (plaintiffs' "mere[] offer to provide additional details regarding facts they have already alleged" is not basis for repleading); *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied."); *In re Elevator Antitrust Litig.*, 2006 WL 1470994, at *12 (S.D.N.Y. May 30, 2006) (denying leave to replead because "it would be grossly unfair to defendants to be faced with another amended complaint and the necessity of another motion, particularly since there is no indication whatever that plaintiffs would do any better"), *aff'd*, 502 F.3d 47 (2d Cir. 2007); *Stephens v. CMG Health*, 1997 U.S. Dist. LEXIS 23797, at *45-46 (S.D.N.Y. July 22, 1997) (denying leave to amend where "[p]laintiffs have not advised the Court of any facts which make it likely that it can plead a valid antitrust cause of action").  The FLPs' request for leave to replead also should be evaluated in view of the prior proceedings in this case:  the FLPs filed the first of their actions in August 2013 and later filed a consolidated amended complaint in this Court (ECF No. 229), which they then corrected not once but twice (ECF Nos. 235 & 271).  Their supplemental submissions have not shown that another amendment is warranted.

             *      *      *

     For these reasons, as well as those set forth in defendants' prior memoranda, the FLPs' claims under Sections 1 and 2 of the Sherman Act should be dismissed for failure to state a claim, and leave to replead should be denied.

                        Respectfully submitted,

                        /s/ Richard C. Pepperman, II

cc:    All Counsel of Record (via ECF)

---

[*] The Commercial End-Users similarly assert, without identifying any new proposed factual allegations, that "if provided an opportunity to amend, Plaintiffs would seek to refine and expand upon existing allegations to address any concerns the Court may have regarding the sufficiency of the pleadings."  (ECF No. 486 at 1.)

# Tab C

# COVINGTON & BURLING LLP

BEIJING   BRUSSELS   LONDON   NEW YORK
SAN DIEGO   SAN FRANCISCO   SEOUL
SHANGHAI   SILICON VALLEY   WASHINGTON

ROBERT D. WICK

1201 PENNSYLVANIA AVENUE, NW
WASHINGTON, DC 20004-2401
T 202.662.5487
rwick@cov.com

July 9, 2014

**VIA ECF**

The Honorable Katherine B. Forrest
United States District Court
Southern District of New York
500 Pearl Street
New York, New York  10007

> Re:  Defendants' Response to Joint Supplemental Submission of Mag
> and Agfa in Opposition to All Defendants' Motions to Dismiss,
> *In re Aluminum Antitrust Warehousing Litig.*, No. 13-md-02481

Dear Judge Forrest:

I write on behalf of all defendants in response to the supplemental brief of Mag Instrument and Agfa Corporation (ECF No. 488), which focuses largely though not entirely on Henry Bath and JPMorgan.  As shown below, the supplemental brief fails to rehabilitate Mag and Agfa's complaints against Henry Bath, JPMorgan, or any other defendant.

> **A.   Mag and Agfa's warehouse allegations are insufficient.**

Mag and Agfa's supplemental submission concedes that, in contrast to their allegations against other defendants, they have not alleged that queues exist at Henry Bath warehouses anywhere in the world.  *See* ECF No. 488 at 1 (acknowledging "lack of a specific allegation in the Mag/Agfa complaints that there are queues at any Bath warehouses").  Mag and Agfa do not even allege that Henry Bath has ever had warehouses in either of the locations in which aluminum queues allegedly exist (Detroit and Vlissingen).  The absence of any such allegation speaks volumes:  Mag and Agfa had every incentive to allege that queues exist at Henry Bath if they had a basis for doing so.

Contrary to Mag and Agfa's assertions, their failure to allege that Henry Bath has queues renders their conspiracy claims implausible as to the entire conspiracy.  According to Mag and Agfa, the conspiracy would have unraveled unless *all* LME warehouses were hoarding and trapping aluminum.  *See* Mag Compl. ¶¶ 104-105; Agfa Compl. ¶¶ 105-106; Mag/Agfa Opp. at 49, ECF No. 394 (conspiracy could have succeeded "only so long as all Defendants hoard aluminum such that consumers are deprived of meaningful warehousing alternatives").  No one alleges, however, that Henry Bath had queues or that it hoarded or trapped aluminum at its

COVINGTON & BURLING LLP

The Honorable Katherine B. Forrest
July 9, 2014
Page 2

warehouses. Thus, under Mag and Agfa's own reasoning, the absence of queues at Henry Bath (and indeed at all other LME warehouses other than one in Detroit and one in Vlissingen) should have unraveled the alleged conspiracy by providing alternatives to warehouses encumbered by queues.

The absence of queues at Henry Bath also disrupts any attempt by Mag and Agfa to allege meaningful parallel conduct. Plaintiffs allege only two aluminum queues – one in Detroit and one in Vlissingen – that allegedly developed over a year apart.[1] As Professors Areeda and Hovenkamp have explained, sequential conduct separated by an interval in time is not the type of "parallel conduct" that readily lends itself to an inference of conspiracy. *See* Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1425d1 (2010) ("agreement is ordinarily more difficult to infer from sequential actions, in which interfirm observation is possible, from simultaneous actions, in which it is not"). The absence of queues at Henry Bath also makes clear that Henry Bath and JPMorgan engaged in *divergent* conduct – not parallel conduct – with respect to the warehouse queues at the heart of the alleged conspiracy.

Although Mag and Agfa assert that all defendants engaged in parallel conduct by treating the minimum load-out rate as a maximum (ECF No. 488 at 1-2), they never squarely allege that Henry Bath, Pacorini USA, or any other individual warehouse apart from Metro Detroit actually loaded out at the minimum. At most, they offer generic and conclusory "group pleading" allegations that an undifferentiated group of "Warehouse Defendants" conspired to treat the minimum as a maximum – allegations that are wholly insufficient to state a claim. *See* JPMorgan Reply Mem. at 9 & n.5, ECF No. 442; Glencore Reply Mem. at 3-5, ECF No. 427; Pacorini USA Mem. at 6-8, ECF No. 332.

Even if Mag and Agfa had adequately alleged that (for example) Henry Bath loaded out at the minimum, that allegation would make no difference in the absence of an allegation that loading out at the minimum *generated queues at Henry Bath*. If loading out at the minimum was sufficient to avoid queues at Henry Bath – and Plaintiffs make no allegation to the contrary – then Henry Bath had no reason to load out aluminum any faster. Finally, Plaintiffs fail to explain why loading out at the minimum is contrary to the individual self-interest of *any* defendant, let alone a defendant that has no queues.

    **B.**    **Mag and Agfa's financial firm allegations are insufficient.**

As the Court observed at oral argument, Plaintiffs' conspiracy allegations are like "one hand clapping" unless and until Plaintiffs plausibly allege that the financial firm defendants participated in a conspiracy. *See* Tr. at 183; *see also id*. at 179 ("THE COURT: … [T]his whole

---

[1]    *See* Mag/Agfa Supp. Br. at 1-2, ECF No. 488 (Vlissingen queue began in December 2011); Commercial Compl. ¶¶ 102-105 (Detroit queue began in 2010).

COVINGTON & BURLING LLP

**The Honorable Katherine B. Forrest**
July 9, 2014
Page 3

thing doesn't work unless you have the traders playing an integral role."). Plaintiffs' supplemental submissions point to no such allegations because no such allegations exist. To the contrary, the allegations against the financial firm defendants consist almost entirely of vague and conclusory group-pleading allegations. Plaintiffs fail to identify the specific "agreement" that the financial firms allegedly entered into; they cite no instances of financial firms engaging in parallel conduct that allegedly resulted from an unlawful agreement; and they identify no financial firm conduct that was contrary to the individual self-interest of those firms. *See, e.g.*, JPMorgan Opening Mem. at 13-17, ECF No. 310; JPMorgan Reply Mem. at 10-11, ECF No. 442; GS Reply Mem. at 30, 33-34, ECF No. 457.

Mag and Agfa counter that they could amend their complaints to include allegations that appear in the commercial end-user complaint relating to JPMorgan's alleged cancellation of warrants for aluminum stored in Vlissingen. *See* ECF No. 488 at 1-2. The commercial end-users allege a single cancellation of warrants in which JPMorgan allegedly moved aluminum from an unaffiliated warehouse in Vlissingen to a Henry Bath warehouse in Rotterdam and/or sold the aluminum in the local physical market. *See* Commercial Compl. ¶¶ 143-145. For several reasons, adding those allegations would make no difference here.

First, Plaintiffs do not allege that *every* trading firm that cancelled warrants was a conspirator, and they fail to differentiate JPMorgan's alleged cancellation in Vlissingen from cancellations by other firms. Furthermore, the warrant cancellation allegations against JPMorgan fail to assert (1) that JPMorgan moved aluminum *into* Vlissingen as opposed to receiving warrants for aluminum already located there, (2) that the Vlissingen cancellation was part of a pattern of parallel warrant cancellations involving other defendants, or (3) that JPMorgan acted against its unilateral self-interest in allegedly cancelling the Vlissingen warrants. *See* JPMorgan Reply Mem. at 5, 11-13, ECF No. 442. Finally, these allegations at most allege vertical, rule-of-reason conduct, *see id.* at 12, and none of the complaints adequately allege that warrant cancellation was anticompetitive under a rule-of-reason standard.[2]

Mag and Agfa nevertheless suggest that JPMorgan acted against its self-interest by voluntarily storing aluminum at a competitor's warehouse in Vlissingen, thereby "pay[ing] outsize[d] rents" to its competitor. *See* ECF No. 488 at 2-3. This argument backfires: paying outsized rent to a competitor is precisely what Plaintiffs allege that JPMorgan took action to

---

[2]    On its face, JPMorgan's alleged act of cancelling the Vlissingen warrants would appear to be pro-competitive, not anticompetitive. Plaintiffs do not allege that JPMorgan moved aluminum into Vlissingen; they only allege that it took aluminum out and placed it in a Henry Bath warehouse where it was freely available to the market. Unless and until *someone* cancelled warrants and removed aluminum from Vlissingen, the alleged aluminum "hoard" at Vlissingen would have remained intact, and aluminum would not have reached consumers.

COVINGTON & BURLING LLP

**The Honorable Katherine B. Forrest**
July 9, 2014
Page 4

prevent.  Plaintiffs have not alleged that JPMorgan moved aluminum *into* Vlissingen as opposed to receiving warrants for aluminum already located there.  Plaintiffs do allege, however, that JPMorgan moved aluminum *out of* Vlissingen and into a Henry Bath warehouse that had no queues – thus cutting off any obligation it otherwise would have had to pay rent to a competitor. Commercial Compl. ¶¶ 143, 148.  Apart from this failed JPMorgan example, Mag and Agfa offer no other example of a defendant paying rent to a competitor.

        **C.**     **Mag and Agfa's claims should be evaluated under a rule of reason.**

       Mag and Agfa's supplemental arguments that the *per se* rule applies to its claims are unavailing.  Mag and Agfa's claims, like those of every other plaintiff, involve a hybrid mixture of horizontal and vertical relationships between warehouses, their financial-firm customers, and the LME.  Under settled law, antitrust claims involving these types of novel or unique market relationships should be evaluated under the rule of reason.  *See Hertz Corp. v. City of New York*, 1 F.3d 121, 129 (2d Cir. 1993) ("*per se* rule is used in the relatively narrow circumstance where courts have sufficient experience with the activity to recognize that it is plainly anticompetitive and lacks any redeeming virtue"); *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 35 Fed. App'x 29, 29 (2d Cir. 2002) ("Had [Plaintiff] alleged a purely horizontal relationship between [Defendants], [Plaintiff] would have alleged a per se violation of § 1 of the Sherman Act. Because [Plaintiff] did not so plead, its complaint was subject to scrutiny under the 'rule of reason.'"); *Granite Partners, L.P. v. Bear Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 297 (S.D.N.Y. 1998) ("Courts have recognized that a rigid *per se* classification is especially inappropriate where the complained-of practice is novel or unique.").

       Sincerely,

       s/ Robert D. Wick

cc: Counsel of Record via ECF